IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA

V.                              NO. 10-50108-001

WILLIAM CANNON


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Now before the Court is Defendant's Motion to Suppress and Brief in Support, which was referred to the undersigned on March 22, 2011.  (Doc. 24).  Also before the Court is Defendant's Supplement to Motion to Suppress, filed on April 7, 2011. (Doc. 27).   A hearing on said motion was held on April 8, 2011, and the parties thereafter submitted post-hearing briefs.  (Docs. 32-34).   A Supplemental Hearing was held on May 17, 2011, and, after considering the testimony of the witnesses and the briefs and arguments made by the parties, the Court makes the following findings and recommendations:

**I.  Affidavit and Application for Search Warrant**

**A.**  On July 14, 2010, Springdale Police Detectives Al Barrios and Darrel Hignite[1] presented an Affidavit & Application for Search Warrant to Washington County Circuit Judge Mark Lindsay. (Govt.'s Ex. 3).  In said Affidavit and Application, the detectives stated that they

---

[1]Detective Al Barrios testified he had been with the Springdale Police Department since 1993, and had been assigned to the Criminal Investigation Division for twelve years.  He has been assigned to the internet crimes against children task force, and  serves as the agency's coordinator.  He is also the only computer certified forensic examiner in Springdale, and works on all child cases.  (Tr. 7-8).  Detective Hignite testified he had been with the Springdale Police Department for thirteen years and his focus was on crimes against children.  Both detectives have been trained in the enforcement of laws concerning crimes against children and persons, and are able to recognize methods used by child predators and others involved in child sexual exploitation activities.  The Affidavit and Application (Govt. Ex. # 3) sets forth further information regarding common conduct of individuals having sexual interest in children.

-1-

believed the laws of the State of Arkansas had been violated, and set forth facts establishing the grounds for the Affidavit and the probable cause that the "residence" had been used to violate Ark. Code Ann. § 5-27-304 (Pandering or possessing visual or print medium depicting sexually explicit conduct involving a child) and § 5-27-403 (Producing, directing, or promoting sexual performance). In the Affidavit, the detectives stated that earlier that morning, they responded to a report of child pornography being located inside a commercial business in Springdale. Upon their arrival, the detectives made contact with Captain David Creek, Captain Fire Investigator Inspector in the Fire Marshal's Office of the Springdale Fire Department.[2] The Affidavit stated that Captain Creek advised the detectives that he was conducting a routine fire inspection of the premises, and had searched the entire business except for one room, which was locked. When he asked to go into that room, he was advised that the room was "living quarters for the detail person of the business William Cannon."[3] Captain Creek then told the manager that he was required to inspect the locked room. The manager called the Defendant at another business location to come and unlock the room. The Affidavit continues as follows:

> Cannon said he is currently living in the room and advised Mr. Creek that he could inspect the room but needed to clean up first. Mr. Creek advised that he allowed the individual access to the room for that purpose.
> Mr. Creek stated that at that point he could hear things being moved around in the room. Mr. Creek was then allowed into the room. Mr. Creek stated that he witnessed pictures of small boys on the walls of the living area and also the kitchen area of this room. He said that the boys were in various forms of undress. He said that some of the pictures were of small boys nude stuck to the wall. He said that there were several handmade signs saying "I kill boys" and nude baby dolls being suspended upside down

---

[2]Captain Creek's duties include enforcing the fire code and the city ordinances in Springdale, conducting inspections in commercial buildings and apartments, conducting fire investigations, and public education. (Tr. 214).

[3]As will be discussed later, there is a dispute as to whether Captain Creek was told the rooms were Defendant's living quarters, whether he relayed this information to the detectives, and, if so, when he did so.

in bondage positions.  He said that he also saw a video camera and tripod in the room.

Mr. Creek said that he backed out of the room and began trying to find a location where his cell phone could get reception to call the police.  He said that as he was doing so he witnessed the suspect and also an associate from the business removing items from the room and carrying them out the back of the business.  He said did[sic] not recognize what was being removed from the business other then[sic] the tripod.  (A copy of [Captain Creek's] written statement is attached to the affidavit.)

Detectives then looked in the room in question and noticed there were two adjoining rooms located in this business that appeared to have someone living in it.  The first room appeared to be used as a kitchen area attached to a bathroom.  The second area was a bedroom area with a television.  The detectives noted that the first room was covered with pictures of a small boy that appeared to be of a child actor.  In the bathroom area there were several naked dolls that were suspended upside down by a string.  The mouths of the babies appeared to have tape over them.  There was a wrapping paper covering over the inside of the door entering the first room that had flyers from the National Center for Missing and Exploited Children.  It appeared that someone attempted to remove some of them, but was unable to remove all of them.

In the bedroom area of the quarters contained several handmade signs that said "boys rock, boy killer, I love boys, kill little boys, and boys only."  There were several pictures of boys on the walls.  All appeared to be between 8 years old and 12 years old.  There appeared to be several photographs removed from the wall.  The pictures were affixed to the wall using putty.  There were fragments of pictures that were torn and not removed.  There was one picture located on the South wall of a child appearing to be pre-pubescent with no clothing and exposing a full frontal view of his genital area.

After photographs were collected for the search warrant, the entire building was secured and all employees and non essential personnel were removed from the building in order to obtain a search warrant.

(Govt.'s Ex. 3).

The Affidavit had attached to it the written statement given by Captain Creek, which was introduced at the hearing as Govt.'s Ex. 4.  In Captain Creek's statement, he stated, in pertinent part:

While performing inspection came upon 3 door [sic] which were locked .  Mr. Figueroa [manager] stated he had no key or knowledge of content of rooms.  I stated I needed access.  Mr. Figueroa made a call and said the person with the key would be here soon to let me in.  We completed the inspection of building while waiting on key.  There was joking going on about what might be in rooms.  I was told that person with the key was a "project" of the owners.  I had met this person when I inspected EZ Credit on 652 E Robinson @ which time I found his area (the detail shop) cluttered with freaky

-3-

unnecessary clutter.  Required him to remove it due to fire hazard.  After waiting a few moments three gentlemen arrive by car.  One was the manager from the E Robinson location, the second was the detail guy who was the one with the keys to the rooms and the other was a younger kid who someone said needed to be investigated too.

Mr. Cannon walked in with the keys - I told him I need to inspect the rooms for fire hazards he reconized [sic] me from previous inspection.  He unlocked the dead bolt and asked me if he could have minute before I came in.  My suspessions [sic] were increased after 2-3 minutes of him inside with door closed rummaging around.  I spoke thru the door stating enough time I needed to complete the inspection.  He opened the door and allowed me in.  The 1st room was a small kitchen area with wall papered in a small boys picture from floor to ceiling, kids blocks, toys, cabinet door and drawers damaged.  Off the kitchen was a small bathroom with no light covered in pictures also.  To the right of the kitchen was a dark painted room with a sign above the door which read "Boys Club". In this room was a child bed, big screen TV, multiple boy pictures, signs I (heart) boys, boys, camera tripod etc.  I looked a [sic] Mr. Cannon and said I've seen enough I'm calling authorities.  I told Mr. Cannon to stay on scene and do not leave.  By use of portable radio calling dispatch I requested officers & CID.  During the wait for officers Mr. Cannon and younger guy made trips in and out of rooms to back detail area.  When officers arrived I pointed out the two subjects and showed them the rooms and I could tell additional things were missing that Mr.Cannon had taken down or away.  The tripod was gone, multiple toy dolls that were hanging on the walls were down.

The 3rd room contained a palett (bed) on the floor, walls painted dark, kids bicycles, masks, toys, hair dryer.

(Govt.'s Ex. 4).

Detectives Barrios and Hignite presented their affidavit and application, as well as Captain Creek's written statement, to Judge Lindsay.  A transcript of Judge Lindsay's meeting with the detectives reveals that Judge Lindsay asked the detectives certain questions, including whether they found Captain Creek credible and believable.  Detective Hignite answered in the affirmative, and Judge Lindsay signed the warrant authorizing the search.

## II.    Execution of the Search Warrant

The detectives found and seized from within Defendant's rooms, *inter alia*, fifteen photocopies of nude children - one on the wall and others that appeared to be thrown on the floor by the bed. The images on the floor depicted children appearing to be under the age of 13,

-4-

displaying their genitalia, just as Captain Creek had described to Detective Barrios.  (Tr. 289).

Also found and seized were two laptop computers, one of which was found inside a storage room[4];  a briefcase containing items such as a Harry Potter notebook, 16 mini DV Cassettes, 28 film negative strips;  a tackle box, containing such items as three scalpels with assorted scalpel blades, two boy scout neckerchief slides, a Mickey Mouse pen, ten rubber rings with lights,[5] a gold colored "security" uniform pin, assorted razor blades and safety pins, three small dolls labeled "Thing 1" through "Thing 3", a plastic case containing a MicroSD adapter and 1 MicroSD card, two plastic syringes without needles, two eyedroppers, two Bacagon transformer robots, a Scooby Doo pouch containing 2 razor blade key chains, a black Scooby Doo pouch containing a toy car, and a plastic pouch containing 3 2GB SD cards.

It was later discovered that the laptop computer found in the storage room contained thousands of images of sexually explicit conduct of children and showed multiple visits of websites displaying child pornography.   The mini DVD cassettes contained six hours of Defendant masturbating on camera.  A video of a juvenile female engaged in sex was also found. Detective Barrios interviewed the female juvenile, and confirmed that Defendant produced the video.[6]  (Tr. 40-41).  Also found in the rooms were cameras with SD cards;  separate SD cards;

_____

[4]Detective Barrios testified that during the search, he received information that Defendant had told a co-worker to retrieve a laptop from a storage room. Outside Defendant's room and in a storage room accessible by all employees, officers found the computer, which Defendant asked "Debbie" to hide from the police.

[5]Detective Barrios testified that "in one of the videos," he saw such a ring "being worn around a penis."  (Tr. 116).

[6]On July 21, 2010, a Search Warrant was sought to facilitate a forensic examination of the "electronic evidence" which was obtained from the subject premises as a result of the execution of the search warrant on July 14, 2010. This search warrant has not been challenged.  (Tr. 98).

-5-

Safety Center hand- prints, labeled "Michelle Lane";[7] cell phones; video and mini DV casettes;

a camcorder with tripod and SD card; and books titled "Pictures of Innocence" by Ann Higonnet,

and "The Last Day of Summer" and "Radiant Identities" (which contains photos of nude

children).[8] by Jack Sturges.  Also found in the rooms was a black plastic bag containing 4

ziplocked bags of children's underclothes, CD-R disks, a pair of child's panties with Tinkerbell

print, a pair of black lace panties and a pair of red and black panties.

With the consent of the manager, officers also searched outside the building for

additional evidence that Defendant and his companion might have hidden, with no results.

Subsequent to the search, Defendant was formally arrested on state charges, and taken back to

the Springdale Police Department, where he was booked.

On September 15, 2010, Defendant was indicted in this Court with two counts of

coercion and enticement of a child, five counts of receiving visual depictions of child

pornography, and one count of possession of child pornography.

## III.   Motion to Suppress

On March 22, 2011, the Defendant filed his Motion to Suppress, arguing that the Search

Warrant was not supported by probable cause, as the specific information in the Affidavit which

was applicable to Defendant was conclusory, and factually inadequate and misleading.

Defendant also argued, in the Supplement to the motion, that in executing the search warrant,

the officers demonstrated a flagrant disregard for the terms of the warrant by seizing items that

went beyond the scope of the warrant, and that all of the evidence seized must, therefore, be

---

[7]Detective Barrios stated that Safety Center hand-prints were routinely given by children who were victims of abuse.

[8]Detective Barrios testified that some of the pictures were cut out of the books.

suppressed.

At the initial hearing, and in his post-hearing brief, Defendant raised the issue of whether Detectives Barrios and Hignite needed Defendant's consent to enter the rooms when they initially arrived at the scene, as Defendant contends they were his living quarters and he, therefore, had an expectation of privacy in those rooms.

Subsequent to the initial hearing, the Government asked the Court to hold a supplemental hearing in order to present additional evidence on the issue of consent.[9] The Court conducted a conference call on the request, and concluded that a supplemental hearing was appropriate. On May 17, 2011, the supplemental hearing was held.

## IV.    Hearing Testimony

**A.**  At the hearing, Captain Creek testified that on July 14, 2010, he went to E-Z Credit Auto Sales, a local business in Springdale, Arkansas, to conduct a standard fire inspection. The manager of the business agreed to accompany Captain Creek on the inspection.  While performing the inspection, in an area about half-way between the office area and the garage space, Captain Creek came upon "these doors that were locked," where the glass portholes were covered.  Captain Creek asked the manager what was in the rooms, and the manager made some "jokingly comments about who knows, those are – in his words – Billy's rooms, and he said he doesn't have a key."  (Tr. 216).  The manager contacted Defendant, who was then working at another location, and asked him to return to the premises to unlock the doors.  Defendant and

---

[9]The Court received an e-mail from counsel for the Government, stating that following the initial hearing, when the issue of consent was raised for the first time, he asked Detective Barrios to contact Officer Eric Holland for further details, since he was the initial officer to arrive on the scene.  It was then that Detective Barrios discovered that Officer Holland received consent from Defendant to "step inside" the premises.  When counsel for the Government was told this, he requested a supplemental hearing to further explore the details surrounding Officer Holland's experience at the scene.

another individual arrived shortly thereafter.

**B.**  Captain Creek testified that he recognized Defendant from a previous inspection at the company's other business location, and advised Defendant that the locked rooms needed to be inspected for fire hazards.  Defendant asked Captain Creek if he could have a minute before Captain Creek entered, which Captain Creek allowed.  After waiting two to three minutes and hearing Defendant "rustling" around in the locked rooms, Captain Creek spoke through the door and stated that he needed to complete the inspection.  Defendant then opened the door and allowed Captain Creek into the rooms.  (Tr. 218).

**C.**  Captain Creek testified that the first room he entered was in great disarray.  It was a small room that Captain Creek said could have been a break-room, which had wallpaper with pictures of small boys on the wall from floor to ceiling.  Captain Creek did not believe the room was being used as a kitchen, since it did not have a stove, but felt that it could have been a break-room.  A small bathroom was off of the room, which Captain Creek did not believe was a working bathroom, as the lights did not work.  In the bathroom were a number of nude dolls suspended from the ceiling by string, some with tape covering their mouths, some with what appeared to be blood on them, and some with missing limbs.  Another room off of the kitchen was a dark painted room with a sign above the door which read "Boys Club."  As he entered the room, he saw a toddler bed in a corner and on the walls were numerous dolls hanging upside down from the neck, bound, gagged, mutilated, with arms and legs missing.  (Tr. 222).  There was also material that looked like blood, pictures, signs, a tripod, a big screen TV, and toys that would be used to occupy a child.   The walls were painted black.  Captain Creek also noted several fire code violations. Captain Creek told Defendant he had seen enough, and that he was

-8-

calling authorities, and told Defendant to stay on the scene. Captain Creek requested officers from the Springdale Police Department and the Criminal Investigation Division, and told them over the phone that he believed he had discovered a child pornography operation.

**D.** Captain Creek testified at the hearing that he wished that he had stood outside the door while he was making the call to prevent any entrance back into the rooms, because while standing in the lobby area, he observed Defendant and another individual make several trips in and out of the rooms, and he felt they could be hiding things. Captain Creek was unsure of which items were being removed, but he did notice the camera tripod as one of the items. Captain Creek testified that at that time, he did not know Defendant was using the rooms as living quarters, and no one had told him Defendant was using them as living quarters. In fact, it was against city ordinance for an individual to reside in a commercial building. Instead, Captain Creek was told that Defendant was the owner's "project" and just did detail work at the business. It was not until some point later that Captain Creek was told that Defendant was also a night watchman, and stayed on the premises on occasion. Captain Creek testified that he passed on to the detectives the fact that Defendant was a night watchman and stayed there on occasion. (Tr. 229). Captain Creek testified that the affidavit was not correct when it said that he was advised that the rooms were Defendant's living quarters. (T. 273).

**E.** At the supplemental hearing, the testimony of the business owner, Kendall Wright, was obtained by telephone. Mr. Wright testified that Defendant was employed by him as a car detailer, and in 2007, was also employed as a night watchman at the site in question. He stated that he gave Defendant full permission to live there in exchange for keeping an eye on the car lot at night. Defendant was not paying rent and did not sign a lease. Mr. Wright stated that they

AO72A
(Rev. 8/82)

remodeled the space to include a bedroom and shower, in order to make it more livable for Defendant, and that Defendant was the only one with a key to the rooms.  Mr. Wright stated that he was pretty sure Defendant stayed at the rooms every night.  Mr. Wright testified that he did not put any restrictions on Defendant's living in the rooms, that Defendant kept the door locked at all times, and that other employees understood that they could not enter the rooms without Defendant's permission.  Defendant was also able to access the rooms through the back of the business, after going through the shop.  Mr. Wright testified that he considered the rooms to be Defendant's residence.

**F.**   Springdale Patrol Officer Eric Holland testified that he and Officer Brian Versi initially responded to the call to assist Captain Creek at the business.  Both officers were fully uniformed, wearing a badge and carrying a gun.  When they arrived, Officer Holland noticed Defendant in the hallway with Captain Creek.  He joined them in their conversation, and Captain Creek told Officer Holland, in front of Defendant, what he found when he went inside the rooms.  Officer Holland testified that during this time, Defendant was saying this was his art and that they were blowing this out of proportion.  At that point, Officer Holland turned to Defendant and asked "Do you care if we step inside?"  Officer Holland testified that Defendant said "go ahead."[10]  Officer Holland did not advise Defendant that he needed Defendant's consent, or that he had the right to refuse consent.  Officer Holland testified that although it would have been preferable for him to obtain a written consent from Defendant, he did not do so.  He testified that he believed he needed consent, as he considered the rooms to be private rooms.  Officer Holland

---

[10]Officer Holland later testified that he wasn't exactly sure what Defendant said, but Holland believed he was given permission to enter.

-10-

explained that Captain Creek told him the rooms had been rented out by Defendant and that they were locked.  Believing he had Defendant's consent to enter the rooms, Officer Holland entered and first saw walls papered with pictures of young boys, young boys with older men with their arms around them, and nude Barbie dolls hanging from strings.  He did not look carefully in all three rooms, but after looking briefly, thought there was more than likely child pornography involved.  He stepped back outside the rooms and said this would require a search warrant. Officer Holland testified that the entire time he was there, Defendant was free to leave and was, in fact walking around the business.

**G.**  Soon thereafter, Detective Barrios and Detective Hignite arrived at the scene and met Captain Creek in the lobby of the business.  Captain Creek gave the detectives a brief rundown of what he found in the rooms, and, according to Detective Barrios, Captain Creek stated that he observed some disturbing posters and photocopies and images that depicted nude children with genitalia visible, who appeared to be under the age of 13.  (Tr. 11).

Captain Creek then led them to the doorway of the rooms.  Detective Barrios testified that at this point the only knowledge he had was that it was a commercial business in operation and that the rooms had been made up into what looked like a dungeon.  (Tr. 137-138).  Detective Hignite testified that he did not know if he spoke to Captain Creek right before or after he entered the rooms, but he did briefly talk to him just to get an overview, and after Captain Creek completed his written statement, he received the rest of the information.  (Tr. 173).  Detective Hignite also testified that when they were about to enter the rooms, he did not know at that time that the rooms were living quarters, but that when he saw a bed in one of the rooms, he then heard from Captain Creek that they were living quarters.  (Tr. 174).  Upon cross-examination,

-11-

Detective Hignite stated that he did not know exactly at what point he learned the rooms were Defendant's living quarters, but it came up prior to the preparation of the Affidavit and prior to leaving the scene.  (Tr. 178).

**H.**  Detective Barrios stated in the Affidavit that when they arrived on the scene and made contact with Captain Creek, he advised them that he had searched the entire business except for one area, and was advised that the rooms were living quarters for the detail person of the business, William Cannon.  The Affidavit states that "Cannon said he is currently living in the room and advised Mr. Creek that he could inspect the room but needed to clean up first." When asked at the hearing whether Captain Creek told him before he entered the rooms that they were Defendant's living quarters, Detective Barrios explained that the statement in the Affidavit was out of sequence, and that he actually had already entered and scanned the rooms before Captain Creek told him the rooms were Defendant's living quarters.  Detective Barrios testified that at the time he entered the first room, as far as he was concerned, it was part of the business, and that if he had believed it was Defendant's residence or private home, then he would have either attempted to obtain Defendant's consent to search or would have sought a search warrant prior to entering the rooms.  (Tr. 198-199).

**I.**  Detective Barrios testified that the door to the rooms in question was open, and from the hallway, he could see the wallpaper of the pictures of boys on the walls in the kitchen area, and the upside down nude dolls suspended from the ceiling in the bathroom.  The dolls were in various poses, some of them in bondage, some of them contained plastic cellophane wrapped around their faces to make it look as if they had been asphyxiated, some of them were missing limbs, some of them had blood on them.  Detective Barrios testified that Captain Creek

-12-

accompanied them into the rooms, and that it was not until he went into the third room area and he saw the bed and then heard from Captain Creek that Defendant stayed there, that he then became concerned of the potential privacy issue. (Tr. 138).  Prior to that, Detective Barrios still believed the rooms were part of the commercial business, and it was his understanding that the business had no objection to them inspecting the entire premises.

**J.**  Captain Creek testified that when he accompanied the detectives into the rooms, he could tell additional items were missing which Defendant had removed - a tripod was gone, and multiple toy dolls that were hanging on the walls were down.  In the first room, Detective Barrios testified that he noticed several of the walls were covered with 100 to 200 small images of a child's face that he later confirmed to be Zac Hanson from the Hanson Brothers group.  (Tr. 11). From the bathroom area, there was a doorway leading into another room and above the doorway there was a sign that said "The Little Boys Club." (Tr. 12).  There was metallic wrapping paper covering the inside of the door which opened into the third room, and on the back of the door Detective Barrios saw a couple of NCMEC (National Center for Missing and Exploited Children) flyers.  One of the NCMEC posters Detective Barrios later identified as being a legitimate NCMEC issued poster. (Tr. 13).  The walls were painted black in the third room, and the detectives found several handmade signs that said "I Heart Little Boys," with a heart sign, "Little Boy Sex," "Kill Little Boys," "I Eat Little Boys." (Tr. 18).  There were dolls that were hanging upside down from the ceiling and one was a nude doll that was holding a pair of scissors stuck through its mouth with simulated blood coming from it.  There were several pictures of boys on the walls, and all of them appeared to be between the ages of 8 and 12 years of age. There also appeared to be several photographs removed from the wall. One picture that was

-13-

located on the South wall was of a fully nude child appearing to be a pre-pubescent boy, exposing a full frontal view of his genital area. Portions of the boy's arms and legs were covered with a mirror on one side and another picture on the other side so that the focal point of the picture was the boys head, torso and genitalia. There were "Chuck-E dolls," and pictures of children sleeping in shorts on the wall. Detective Barrios testified that in his opinion, the motif of the area was sex and violence towards children, and that in his mind, there was a possibility of a "hands-on" event.

**K.** Detective Barrios then took photographs of the rooms, and instructed the officers to secure the premises, so that he and Detective Hignite could obtain a search warrant to further search the rooms. At that point, Detective Barrios asked Defendant if he would be willing to go to his office for an interview, to which Defendant consented. Defendant was transported to Detective Barrios' office by a patrol officer, and Detective Hignite prepared the Application and Affidavit for Search Warrant, while Detective Barrios proceeded to interview Defendant. Prior to the interview, Detective Barrios advised Defendant that he was not being arrested and gave him his Miranda rights, which Detective Barrios testified was his standard operating procedure. Defendant acknowledged his rights and signed the appropriate form. (Gov't. Ex. # 2).

During the interview, Detective Barrios addressed the picture of the fully nude boy with Defendant, and Defendant first told him it came from a magazine, and later said it came from a book. Detective Barrios testified that regardless of where the image came from, in the context of that room, he considered it to have overt sexual and violent connotations. (Tr. 25). He further testified that he was skeptical of Defendant since there were several instances in the interview where there were contradictions and inconsistent statements, and facts he learned and

-14-

confirmed later not to be true.  (Tr. 25).  Defendant told Detective Barrios that everything in the

room was his "art work" and that the images came from an "art book."  He stated that the images

were meant to be offensive, but not sexual, although he stated that he never showed his "art" to

anyone except a few friends.   When Detective Barrios asked him if there was other child

pornography in the room, Defendant stated there might be a couple of images, which he

considered art, on the laptop computer. Also during the interview, Defendant told Detective

Barrios that he stayed at the rooms three nights a week as a security guard for the business, and

that he actually did not have a home. (Tr. 82).  Detective Barrios testified that after they finished

preparing the Affidavit and interviewing Defendant, he was transported back to the business

premises by a patrol officer.

**L.**  Detective Barrios and Detective Hignite signed the Affidavit and presented it to

Washington County Circuit Judge Mark Lindsay.  (Gov't.  Ex. #3).  Detective Barrios and

Detective Hignite testified that they also offered the pictures they took at the scene to Judge

Lindsay for him to view, but he declined.  (Tr. 33).

**M.**  The search warrant was thereafter executed at the subject property, and Detective

Barrios advised Defendant it was up to him whether he wanted to stay during the search, since

he was not in custody at that time.  Defendant chose to stay, and he moved freely about the

premises.

## V.  Discussion

### A.  Did Defendant Have a Privacy Interest in the Rooms?

When moving to suppress evidence on the basis of an alleged unreasonable search, the

Defendant has the burden of showing a legitimate expectation of privacy in the area searched.

-15-

Whether a Defendant has a constitutionally protected expectation of privacy involves a two-part inquiry - the Defendant must show that: (1) he has a reasonable expectation of privacy in the areas searched or the items seized; and (2) society is prepared to accept the expectation of privacy as objectively reasonable. United States v. James, 534 F.3d 868, 872-73 (8th Cir. 2008), cert. denied, 129 S.Ct. 2818 (2009).

The Court believes the facts support the conclusion that the rooms in question were being used as living quarters by Defendant. Mr. Wright, the owner of the premises, testified that he made improvements to the rooms so that they could be used by Defendant as living quarters. Further, the pictures of the rooms which were introduced as exhibits at the hearing reflect: the presence of hygiene items and clothes in the bathroom; a bed, albeit a toddler race-car bed, in another room; and the rooms were filled with Defendant's property. Further, the manager called the rooms "Billy's rooms." Mr. Wright also testified that there was no master key that fit all of the rooms, and that Defendant was the only one with a key to the rooms. In addition, the rooms were kept locked by Defendant at all times and the glass portholes were covered for privacy. It is true that Detective Barrios testified that when he interviewed Defendant, Defendant stated that he stayed there three nights a week as a security guard but actually had no home. However, a place need not be one's conventional "'home'" in order for one to have a legitimate expectation of privacy there. Minnesota v. Olson, 495 U.S. 91, 96-97 (1990). The Court finds that based upon all of the facts in this case, Defendant had a privacy interest in the rooms.

**B. Did Defendant Have a Reasonable Expectation of Privacy in his Personal Belongings?**

The government argues, in its post-hearing brief, that even if the Court concludes

-16-

Defendant maintained a Fourth Amendment right to privacy in the rooms, Defendant did not have a "reasonable" expectation of privacy in his personal belongings and child pornography. (Doc. 33 at p. 9). The government contends that given the commercial nature of the premises in question, Defendant's expectation of privacy was not reasonable when he placed child pornography on the walls of a building subject to various inspections and co-worker/owner entry.[11]

In support of its position, the Government cites New York v. Burger, 482 U.S. 691 (1987), in which the Supreme Court held that an expectation of privacy in commercial premises is less than a similar expectation in an individual's home. Id. at 700. Although an argument can be made in the present case that Defendant knew that the business, including the locked rooms, were subject to inspection for fire code compliance, and that he, therefore, had no reasonable expectation of privacy in any items in plain view of a fire inspector, the Court does not believe this knowledge impacts his privacy interest as to a criminal search of the rooms. A similar issue can be found in Bruce v. Beary, 498 F.3d 1232, 1239-40 (11th Cir. 2007), where the Court found:

> The warrantless administrative inspection, however, remains an exception to the Fourth Amendment's general rule that a warrant-supported by probable cause and specifying what is to be seized - is required when law enforcement seeks to search private property. The administrative search exception does not confer authority on law enforcement to ignore the requirement for a warrant where "the primary purpose [of the search or seizure] was to detect evidence of ordinary criminal wrongdoing." (citation omitted). In Burger, the Court rejected the idea that an administrative inspection may be used to gather evidence as part of what is, in reality, a criminal investigation. (citation omitted). The Court upheld the inspection of Burger's automobile junkyard, in part, because "[t]here [was], furthermore, no reason to believe that the instant inspection was actually a 'pretext' for obtaining evidence of respondent's violation of the penal laws." (citations omitted)

---

[11]Mr. Wright testified that no one at the business location, other than Defendant, had access to the rooms.

-17-

Id. at 1239.  In the present case, it is clear that the primary purpose of Officer Holland's entry into the rooms, as well as Detectives Barrios and Hignite's initial entry into the rooms, was to detect evidence of ordinary criminal wrongdoing.  Accordingly, the Court is compelled to conclude that Defendant had both an expectation of privacy in the rooms and an expectation of privacy – from a criminal search –in his personal belongings.

**C.  As the Defendant Had a Privacy Interest in the Rooms and its Contents, Did Exigent Circumstances or Consent Exist to Justify Entering the Rooms Without a Search Warrant?**

Since the officers had arrived and secured the scene prior to the initial entry of Detectives Barrios and Hignite into the rooms, there was no risk of evidence being removed from the scene, and, therefore, exigent circumstances were not present.  With respect to whether there was consent, a consensual search may not exceed the scope of the consent given.  The scope of consent for a search is limited to what a reasonable person would have understood by the exchange between the investigating officer and the person to be searched.  United States v. Dinwiddie, 618 F.3d 821, 831 (8th Cir. 2010), cert. denied 131 S.Ct. 1586 (2011).

In the present case, Captain Creek had the business manager's permission to inspect the premises, and after finding the locked doors, he also had Defendant's consent to enter the rooms in question for purposes of inspecting the rooms for fire code violations.  Captain Creek consistently testified that when he entered the rooms, he had no idea that Defendant was using the rooms as living quarters.  The question is whether Detectives Barrios and Hignite had consent to enter the rooms initially without a search warrant.

As stated earlier, Officer Eric Holland testified that he asked Defendant: " Do you care if we step inside" and thought he remembered Defendant saying "go ahead."  The question is

-18-

whether this consent extended to Detectives Barrios and Hignite when they made the initial

warrantless search, even though they were unaware of the consent given to Officer Holland.

The Government refers to the case of <u>United States v. Gillette</u>, 245 F.3d 1032 (8th Cir.

2001, <u>cert. denied</u>, 534 U.S. 982 (2001), in support of its position that although the consent given

to Officer Holland was not relayed directly to Detective Barrios at the time of his entry, the

Defendant did not revoke his consent, or limit it in any manner.  The Government relies on the

"collective knowledge" theory discussed in <u>Gillette</u>:

> [w]here officers work together on an investigation, we have used the so-called "collective knowledge" theory, <u>United States v. Gonzales</u>, 220 F.3d 922, 925 (8th Cir. 2000), to impute the knowledge of one officer to other officers to uphold an otherwise invalid search or seizure.  Under this rationale, the validity of a search "may be based on the collective knowledge of all of the law enforcement officers involved in an investigation if ...some degree of communication exists between them," (citations omitted).  The requirement that there be a degree of communication serves to distinguish between officers functioning as a "search team," (citations omitted), and officer acting as independent actors who merely happen to be investigating the same subject.

<u>Id.</u> at 1034.

The Defendant argues that the facts in the more recent case of <u>United States v. McMullin</u>,

576 F.3d 810 (8th Cir. 2009), are more directly on point, and that based upon the Eighth Circuit's

reasoning in <u>McMullin</u>, a new consent was required when Detectives Barrios and Hignite entered

the premises.

The Court finds the facts in the <u>Gillette</u> case to be distinguishable from the facts in the

present case, which involves the search of a person's private residence, rather than a search of

a vehicle.  In addition, in the present case, when Officer Holland left the scene, after his search,

he had concluded that a search warrant was required, and the consensual search was completed

at the time of his departure..

-19-

The McMullin case is more instructive on this issue.  In McMullin, the marshal had consent to enter the house, but thereafter went out into the backyard with Defendant and proceeded to handcuff him.  The marshal then re-entered the Defendant's house a second time after the handcuffing.  McMullin asserted that the marshal lacked legal authority to re-enter his house, while the government contended that McMullin never withdrew the consent he granted for the initial entry.  Id. at 812.  The court recognized that in this circuit, when an occupant of the house gives consent for entry, "he must make an unequivocal act or statement to indicate the withdrawal of the consent."  Id. at 815.  The court continued:

> Additionally, "[t]he standard for measuring the scope of a [person]'s consent under the Fourth Amendment is that of 'objective' reasonableness-what would the typical reasonable person have understood by the exchange between the officer and the suspect?"  (citation omitted).  In assessing the scope of a person's consent, we must examine the totality of the circumstances, which includes the language of a person's consent and his actions during the officers' search.

Id.  The Eighth Circuit concluded that a new consent was required for the second entry, stating that by the time the marshal sought re-entry into McMullin's house, it was undisputed that the marshals had already completed their task of arresting the person they were initially seeking to detain in the backyard, and there was no necessity or legal basis for the officer to re-enter the house.  The court held: "Under the circumstances of this case, we determine that Marshal Newlin's re-entry exceeded the scope of McMullin's consent and therefore violated the Fourth Amendment prohibition against unreasonable entries into a person's house."  Id. at 816.

Clearly, the conclusion the court reached in McMullin would apply in this case, where Detectives Barrios and Hignite were not even the same officers who obtained the initial consent - it was Officer Holland, and he had already exited the rooms and left the premises without even

-20-

speaking to Detectives Barrios and Hignite.  Furthermore, the Eighth Circuit has also held that

when consent is given to enter a person's home, "the officer does not have free reign to wander

around the home and search any area of the house, without further consent."  <u>United States v.</u>

<u>Castellanos</u>, 518 F.3d 965, 970 (8th Cir. 2008).  The Court finds that the initial consent allowing

Officer Holland "to step inside" did not extend to Detectives Barrios and Hignite entering and

wandering through each room.

     The Court notes that the consent given to Captain Creek to enter the rooms likewise did

not extend to the detectives, as Detective Barrios acknowledged that the Fire Department was

a different entity from the Police Department, and that Defendant did not give consent to the

Detectives Barrios or Hignite.

     Based on the foregoing, the Court concludes that neither exigent circumstances nor

consent justified the detectives warrantless entry into the rooms.

### D.  Does the Independent Source Doctrine Apply?

     In <u>United States v. Craig</u>, 630 F.3d 717, 721 (8th Cir. 2011), the Eighth Circuit addressed

the independent source doctrine:

> A warrant obtained after an illegal search is not an independent source if either of the
> following are true: "if the agents' decision to seek the warrant was prompted by what
> they had seen during the initial entry," and "if information obtained during that entry was
> presented to the Magistrate and affected his decision to issue the warrant."  <u>Murray [v.</u>
> <u>United States</u>], 487 U.S. [533], 542 [108 S.Ct. 2529, 101 L.Ed.2d 472 (1988)].  In other
> words, <u>Murray</u> asks the following two questions, both of which must be answered in the
> affirmative for the warrant to be an independent source: first, would the police have
> applied for the warrant had they not acquired the tainted information; and second, do the
> application affidavits support probable cause after the tainted information has been
> redacted from them.

<u>Id.</u>

In the present case, the first question can be answered affirmatively, as Detective Barrios

-21-

testified that had he known the rooms were a private residence, he would not have entered them, but would have instead sought a search warrant. (Tr. 198- 199). The second question can be answered affirmatively as well, because the information Captain Creek provided to Detectives Barrios and Hignite would have been sufficient, standing alone, to establish probable cause for the issuance of a search warrant. As detailed in Captain Creek's written statement, which was submitted in support of the search warrant application, Captain Creek advised the detectives that when Defendant brought the key to the rooms and was asked by Captain Creek to unlock the door so he could inspect it, Defendant asked if he could have a minute before Captain Creek came in to inspect. After waiting two or three minutes, Defendant opened the door and allowed Captain Creek in. Captain Creek reported that the first room was a small kitchen area with the walls papered in a "small boys picture from floor to ceiling, kids blocks, toys, cabinet door and drawers damaged." The bathroom off of the kitchen had no light and was also covered with pictures. A dark painted room was to the right of the kitchen, with a sign above the door which read "Boys Club." The room contained a child bed, a big screen television, multiple boy pictures, signs that said I (heart) Boys, Boys, and a camera tripod. At that point, Captain Creek reported that he told Defendant he had seen enough and was calling authorities. He also told Defendant to stay on the scene and not to leave. Captain Creek called for officers to come to assist him, and while doing so, Defendant and a "younger guy" made trips in and out of the rooms to the back detail area. When Captain Creek went back into the rooms with the Detectives, he could tell that additional things were missing that Defendant had taken down or away - the tripod was gone, and multiple toy dolls were down.

The Court credits Detective Barrios' testimony that Captain Creek also provided the

-22-

detectives with the following information, which they detailed in their affidavit in support of the warrant:

> Mr. Creek stated that he witnessed pictures of small boys on the walls of the living area and also the kitchen area of his room.  He said that the boys were in various forms of undress.  He said that some of the pictures were of small boys nude stuck to the wall.  He said that there were several handmade signs saying "I kill boys" and nude baby dolls being suspended upside down in bondage positions.

Detective Barrios' testimony as to what Captain Creek advised the detectives of was corroborated by the fact that nude pictures were ultimately found.  The Court believes that Detective Barrios had a better recollection of what was conveyed to him by Captain Creek than Captain Creek did.  Captain Creek's memory did not seem as clear at times.  For example, while Captain Creek did not recall telling anyone that Defendant was renting the rooms in question, both Officer Holland and Detective Barrios, who separately spoke to Captain Creek, stated that Captain Creek told them that.

In determining whether probable cause supports a search warrant, the Court must consider whether a "fair probability that contraband or evidence of a crime will be found in a particular place, given the circumstances set forth in the affidavit." United States of America v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010), cert. denied, 131 S.Ct. 1469 (2011) quoting United States v. Horn, 187 F.3d 781, 785 (8th Cir. 1999), cert. denied, 529 U.S. 1029 (2000).  "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Colbert, 605 F.3d at 576, quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)(internal quotation omitted).  This determination requires a "commonsense analysis of the facts available to the judicial officer who issued the warrant." Colbert, 605 F.3d at 576.  In United States v. Mutschelknaus, 592 F.3d 826

-23-

(8ᵗʰ Cir. 2010), also a case also involving child pornography, the Eighth Circuit stated:

> "Whether probable cause to issue a search warrant has been established is determined by considering the totality of the circumstances, and resolution of the question by an issuing judge should be paid great deference by reviewing courts." (citations omitted). "As a general matter, an issuing court does not need to look at the images described in an affidavit in order to determine whether there is probable cause to believe that they constitute child pornography. A detailed verbal description is sufficient." (citations omitted).

Id. at 828-29.

The Court believes that Captain Creek's written statement and the other information he provided to the detectives that was detailed in the affidavit established probable cause to support the issuance of the search warrant. See United States v. Soderstrand, 412 F.3d 1146 (10ᵗʰ Cir. 2005), cert. denied, 547 U.S. 1004 (2006)(holding that where affidavit in question indicated that the safe contained photographs and computer disks, one of which contained an image of "naked" children, the affidavit was sufficient for the issuing judge to reasonably conclude that images of child pornography might reasonably be expected to be contained within the computer disks, CDs or other data storage devices contained in the safe). Therefore, the independent source doctrine would allow the admission of the evidence seized.

### E.  Even if the Independent Source Doctrine Did Not Apply, Would the Leon Good Faith Exception Apply to the Detectives Initial Warrantless Entry into the Rooms?

Some courts hold that the good faith exception set forth in United States v. Leon, 468 U.S. 897 (1984), does not apply when it is a warrantless search. United States v. Herrera, 444 F.3d 1238 (10ᵗʰ Cir. 2006). The Eighth Circuit appears to apply the good faith exception even if it is a warrantless search. In United States v. Conner, 127 F.3d 663 (8ᵗʰ Cir. 1997), the government appealed the district court's suppression of evidence obtained after police demanded

-24-

entry into a motel room rented by appellants.  Defendant contended that the police officers used

illegal methods to obtain the information relied on to establish the probable cause to issue the

search warrant.  After addressing the consent issue, and concluding that Defendants did not

voluntarily consent to the officers' entry, the Court addressed the government's alternative basis

for reversal, that either the good-faith or the inevitable-discovery exception (closely related to

the independent source doctrine - <u>United States v. Swope</u>, 542 F.3d 609, 613 (8th Cir. 2008),

<u>cert.denied</u>, 129 S.Ct. 1018 (2009) quoting <u>Nix v</u>. <u>Williams</u>, 467 U.S. 431, 443 (1984)) to the

exclusionary rule rendered the evidence admissible, despite the Fourth Amendment violation in

gaining access to the motel room. The Eighth Circuit stated:

> The ultimate question under <u>Leon </u>is whether the officers "had an objectively reasonable basis to believe they were complying with [applicable law] and the Fourth Amendment." (citation omitted).  In the context of investigatory stops, we have stated that suppression is unwarranted where pre-warrant police conduct was "close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable." (citations omitted).  If, on the other hand, the officers' pre-warrant conduct is "clearly illegal," the good-faith exception does not apply. (citation omitted).

<u>Id.</u> at 667.

In the present case, if the detectives believed in good faith that the rooms were not a

private area, the exclusionary rule does not apply.  Detective Barrios testified that Captain Creek

did not advise him that Defendant stayed in the rooms until after the entry into the rooms and,

based on the information he had, Detective Barrios thought the entire area was a commercial

business area.  Captain Creek himself testified that the first two rooms did not look like a living

area, but maybe a break area - the kitchen did not have a stove, and the bathroom did not appear

to be working.  Captain Creek did not have the impression that it was a residence either.

The Court does not believe that the detectives knew they were violating the Fourth

-25-

Amendment by scanning the rooms, because they were reasonable in their beliefs that the rooms were not a private residence.  The Court therefore concludes that the <u>Leon</u> exception bars application of the exclusionary rule in this case, and that the details in the Affidavit and Application for Search Warrant derived from the detectives entry and scan of the rooms can properly be considered in determining the existence of probable cause.  Since the Court finds that the information provided by Captain Creek alone established probable cause, additional information provided, based on the detectives' view of the rooms, further supported probable cause.  The Court next addresses the specific deficiencies alleged by the Defendant to exist in the Affidavit and issuance of the warrant.

**F.      Specific Deficiencies Alleged by Defendant**

**1. Whether the Affidavit Provided a Detailed Description of the Alleged Pictures:**

In his motion, Defendant argues that the Affidavit did not provide any detailed descriptions of the pictures in question.  He argues that the detectives stated they observed only one picture located on the South wall of a child appearing to be pre-pubescent, with no clothing on and exposing a full frontal view of his genital area.  Defendant states that this picture did not meet the minimum statutory definition under § 5-27-302(e)(1) (lewd exhibition of the genitals), and that the picture was in reality simply a full frontal nude picture of a pre-pubescent male, and was not sexually suggestive.  Defendant further argues that the judge should have viewed the images, and that the picture upon which the affidavit was based had been previously determined not to be child pornography, and was not produced using Defendant's alleged video camera and tripod.

-26-

An affidavit establishes probable cause for a warrant if it "sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." Mutschelknaus, 592 F.3d at 828. As stated earlier, this is determined by considering the totality of the circumstances. In the present case, Captain Creek's statement alone sets forth sufficient facts to establish a fair probability that contraband or evidence of criminal activity would be found in the locked rooms. Additionally, Detectives Barrios and Hignite observed the wallpaper of pictures of small boys, naked dolls hanging upside down with tape over their mouths, signs stating "boys rock," "boy killer," "I love boys," "kill little boys," and "boys only." They also described one picture of a nude pre-pubescent boy exposing a full frontal view of his genital area. Detective Barrios testified that based upon his training and experience, the picture of the nude boy was in and of itself a violation of the Arkansas law relating to possession, pandering, and child pornography - to him it was a lewd exhibition of the genitalia. (Tr. 88). In Soderstand, supra, the Tenth Circuit found one image of "naked" children sufficient probable cause for the issuing judge. The Court believes the Affidavit in the present case contained a sufficiently detailed description so as to establish probable cause of criminal activity.

**2. Whether the Picture of the Nude Pre-pubescent Male was Sexually Suggestive**:

Defendant contends that the picture of the nude pre-pubescent male failed to meet the strict statutory definition for Ark. Code Ann. § 5-27-304 "Sexually Explicit Conduct, Children." Detective Barrios testified that considering the context in which the picture of the nude boy was

-27-

found, he found it to be lewd and lascivious.[12]   Since the background and parts of the boys arms and legs had been covered and are not visible, Detective Barrios believed the focal point of the picture was the boy's genitalia.   In George v. State, 358 Ark. 269, 280 (2004), the Arkansas Supreme Court held that photographs possessed by the defendant showing bare breasts of 14 year-old girls constituted a "lewd exhibition" and therefore constituted images of sexually explicit conduct."  A photo may be considered a "lascivious exhibition of the genitals" suitable to warrant probable cause when "the focal point of the visual depiction is on the child's genitalia or pubic area...." United States v. Dost, 636 F.Supp. 828, 832 (S.D. Cal. 1986), aff'd sub nom United States v. Weigland, 812 F.2d 1239 (9th Cir. 1987), cert. denied, 484 U.S. 856 (1987). Clearly, the focal point of the picture of the young nude boy is the child's genitalia.  Detective Barrios testified that considering the context in which the picture of the nude boy was found, he found it to be lewd and lascivious.

**3.   Whether the Detectives Intentionally Mis-Described the Nature of the Single Picture Identified by the Affidavit and Failed to Inform the Circuit Judge that the Picture Came from a Book of Art:**

Defendant argues that the nude picture of the pre-pubescent male is from page 66 of *Radiant Identities*, a book of photographs by Jock Sturges, which was found among Defendant's belongings during the execution of the search warrant.  Defendant further states that historically, Jock Sturges was investigated for producing child pornography, and that on April 25, 1990, Mr.

---

[12]Detective Barrios testified that state statute defines child pornography as a "lewd" exhibition of genitals, and federal statute requires it to be "lascivious."  He believed the nude picture of the pre-pubescent boy constituted a lewd exhibition of genitalia and, since the boy's genitalia was the focal point of the picture, it constituted lascivious.  The Arkansas Supreme Court has defined "lewd" as a common word with an ordinary meaning. Blacks Law Dictionary defines "lewd" as "obscene or indecent; tending to moral impurity or wantonness." George v. State, 358 Ark. 269, 280 (2004)

AO72A
(Rev. 8/82)

Sturges, "whose work hangs in the Metropolitan Museum of Art as well as other acclaimed galleries, endured a search of his apartment and all of his belongings." (Doc. 24 at p. 18). Defendant states that the government was unsuccessful in securing an indictment against Mr. Sturges, and the affiants "recklessly disregarded this fact which should have been confirmed before seeking a warrant to search Defendant's residence." (Doc. 24 at 18). Defendant argues that once affiants received information regarding the legality of the image, they were obligated to determine the accuracy of the information before advising the Circuit Judge that said image contained the sexually explicit conduct involving a child that the statutes require.

The Court is not persuaded by Defendant's argument. Detective Barrios testified that during the initial interview with Defendant, he told Detective Barrios that the photo was from a magazine, and then later stated it was from a book, that it was not sexually suggestive, and was meant to be offensive, but not sexual. The only requirement is probable cause of evidence of a crime. Detective Barrios testified that he disagreed with Defendant's characterization of the picture of the nude pre-pubescent boy, and believed it to be sexually suggestive, especially in light of the totality of the circumstances. The Court believes it was reasonable for Detective Barrios not to believe Defendant when he said they were not sexual. As urged by the government, just because Defendant stated he received the pictures from an art book does not necessarily mean they are not child pornography. On the contrary, it is for a judge to determine whether something is child pornography, based upon the legal standard for the particular jurisdiction. Considering the context in which the picture was found, the photo of the nude child could be considered child pornography. Furthermore, as stated earlier, the photo in question was

-29-

not the sole basis for a probable cause determination in this case, and it is only necessary for an affidavit to provide information which shows a probability of criminal conduct.  <u>United States v. Summage</u>, 481 F.3d 1075, 1078 (8th Cir. 2007), <u>cert. denied</u>, 552 U.S. 1104 (2008).

With regard to Defendant's argument that the detectives included information about the camera and tripod in order to mis-lead the judge, the Court believes these items were, in fact, relevant to the probable cause determination, since they might have been used to produce some of the images in question, and were not included to mis-lead the judge.

**4.   Whether the Information Regarding the Pictures, Handmade Signs, Video Camera and Tripod Were Included Only to Elicit an Emotional Reaction.**

Defendant argues that the information regarding the pictures and handmade signs, video camera and tripod were included in the Affidavit only to elicit an emotional reaction.  Defendant is taking such evidence out of context in this case.  All of these items, considering them under the "totality of the circumstances" test, along with the items found on the premises, although each might be innocent at first glance, established probable cause to believe a crime was being committed.  Certainly, possession of the video camera or tripod are not, in and of themselves, illegal to possess.  In <u>United States v. Alexander</u>, 574 F.3d 484, 490 (8th Cir. 2009), <u>cert. denied</u>, 130 S.Ct. 3273 (2010), the Eighth Circuit found that the officers' search of computer equipment and other digital devices was permissible, even though the initial search only revealed child pornography on a VHS tape.  Similarly, a reasonable inference can be made in the present case that the presence of a camera tripod implied the presence of a camera nearby, which could have been used to produce child pornography.  The fact that the items could be used for other legal purposes does not convince the Court otherwise.  In <u>Mutschelknaus</u>, 592 F.3d at 829, the Eighth

-30-

Circuit held:

> [M]erely identifying an alternative, non-criminal explanation for the information in a warrant is not sufficient to render it defective, unless that explanation eliminates the fair probability that evidence of criminal activity will be found at the described location."

Id.   In the present case, the signs, camera and tripod were reasonably included in the Affidavit as evidence of probable cause, not to mis-lead the judge.

### 5. Whether Judge Lindsay Was Required to View the Photographs:

Defendant's argument that Judge Lindsay failed to review the pictures is also not persuasive.  The Court in Mutschelknaus addressed this issue, quoting United States v. Lowe, 516 F.3d 580, 586 (7th Cir. 2008):

> "As a general matter, an issuing court does not need to look at the images described in an affidavit in order to determine whether there is probable cause to believe that they constitute child pornography.  A detailed verbal description is sufficient."

Mutschelknaus, 592 F.3d at 828-29.  Additionally, as stated earlier, the photos of the images were made available to Judge Lindsay, but he declined to look at them, relying instead upon the detailed description given in the Affidavit.

### 6. Whether the Affidavit was Required to Establish that Defendant was a Pedophile or Child Pornographer:

Defendant argues that there was no "mail cover" to determine if he was receiving mail from or sending mail to child pornographers, there was no surveillance of Defendant, the agents did not attempt to entice Defendant by utilizing fake solicitations, there was no internet tracking or specific files known to contain child pornography to or from his computer, and there were neither prior arrests nor allegations of illegal activity by Defendant.  The Affidavit must establish probable cause for a warrant by setting forth sufficient facts to establish there is a fair probability

-31-

that contraband or evidence of criminal activity will be found in a particular place to be searched, not that Defendant was a pedophile or child pornographer.  Id. at 828.

**7. Whether the Leon Good-Faith Exception Justified the Detectives' Reliance of the Search Warrant:**

Defendant argues that the indicia of probable cause in the Affidavit was so lacking that reliance upon it was unreasonable, and therefore the Leon "good faith" exception does not apply. Under the "good faith" exception, even if this Court were to find there was insufficient evidence to support  probable cause, the evidence seized should not be suppressed because the officers acted in good faith in relying on the issuance of the search warrant.

There are four situations where the good-faith exception to the warrant requirement does not apply:

1.  If the magistrate or judge was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;
2.  Where the issuing magistrate "wholly abandoned his judicial role" when issuing the warrant;
3.  When the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and
4.  Where the warrant is "facially deficient - i.e., in failing to particularize the place to be searched or things to be seized - that the executing officers cannot reasonably presume it to be valid."

Id.at 923.

The Court does not believe the facts in the present case fit within any of the situations described above.  The circuit judge was not misled.  Nor did the judge abandon his judicial role. In fact, Judge Lindsay questioned the affiants on some of the information contained in the Affidavit.  In addition, the Affidavit was neither lacking in indicia of probable cause nor facially

-32-

deficient.  Accordingly, the Court believes the Leon good-faith exception would apply and the

evidence seized would be admissible.

### 8.  Whether the Items Seized Went Beyond the Scope of the Search Warrant:

In his Supplement to the Motion, Defendant argues that the detectives exercised flagrant

disregard for the limitations in the search warrant, requiring the suppression or return of all the

evidence seized during the search.   However, each item seized was addressed at the hearing, and

it was made clear that all of the items seized were either covered by the list of items to be seized

or were in plain view and incriminating in nature.  Defendant argues that cameras, cell phones,

computers, computer disks, electronic storage devices (such as media cards, memory cards, etc.),

hard drives, the briefcase and its contents, and the tackle-box and its contents were not

referenced in the Search Warrant, yet officers seized them anyway.

The Search Warrant in the present case authorized seizure of the following items, *inter*

*alia*:

> a.  Materials depicting or containing child pornography, as defined in § 5-27-304 and
> § 5-27-403; . . .
> k.  E-mail, notes, letters and other documents, and software relating to the exploitation
> and abuse of children; . . .
> m.   Address or telephone books and files reflecting names, addresses or telephone
> numbers, ledgers, cellular phone databases, voice and digital pager information, together
> with all pertinent electronic bills and other account information;
> n.  Pictures, graphic files, binary files, video files, including software applications, or co-
> conspirators, and/or of the sexual abuse or exploitation of children.

(Gov't Ex. # 3).

Detective Barrios testified that:   "graphic files" include anything capable of storing

digital evidence, that includes computers, hard drives, SD cards, cameras, and video cameras

-33-

AO72A
(Rev. 8/82)

(Tr. 102);   "binary files" are just computer files composed of zeros and ones - they can not only

include images, they can contain videos, notes, and word documents (Tr. 102); "video files"

include computer files that depict videos, stored movies, and anything that can be played on a

computer; "software applications" include windows media or programs that allow an individual

to view a movie.   Clearly, the language contained in the warrant authorized the seizure of

cameras, cell phones, computers, computer disks, electronic storage devices, hard drives,

briefcase and items contained therein, and the tackle box and items contained therein.   When

asked about the tackle box and its contents, Detective Barrios stated that he thought it looked like

a serial killer tool kit, and that all items listed in the executed search warrant related to child

pornography except the red felt-tip pen and the women's panties.   Detective Barrios did testify

that the panties were very small panties, and that they seized small potential child's clothing in

the event there might have been a hands-on offense, and when he seized them, he thought they

could be potentially worn by a child.   (Tr. 142).   He further stated that there was clothing of

children's items and signs - and at that point he felt comfortable that probable cause for the child

pornography possession existed.   (Tr. 105).   Detective Barrios also testified that the scope of his

search was essentially for child pornography, "which does include rape and torture towards

children."   (Tr. 121-122).   He further testified:

> I always had the possibility in the back of my mind that there could be a live victim here,
> a live sexual child victim in this case.  So, yes, I did have a little bit of an open mind, but
> at the same time I was cognizant of the scope of the search warrant, so I did try to stay
> within the boundaries and the scope.

(Tr. 122).

The Court believes the items seized, perhaps with the exception of the red felt-tip pen and

-34-

women's panties, were within the scope of the warrant.

**IV.      Conclusion**

For the foregoing reasons, the Court hereby recommends that the Motion to Suppress be denied in all respects.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

Entered this 19th day of May, 2011.

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE

-35-