IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA                              PLAINTIFF

          v.               Case No. 10-50108

WILLIAM CANNON                                        DEFENDANT

<u>O R D E R</u>

Now on this 30th day of June, 2011, comes on for consideration defendant's **Motion to Suppress** (Doc. 24).  The Court, being well and sufficiently advised, finds and orders as follows:

<u>**Procedural Background**</u>

On September 10, 2010, defendant was charged in an eight-count indictment, which generally alleges violations of various child pornography statutes.

On March 22, 2011, defendant filed a motion to suppress, in which he asserts that a search warrant issued on July 14, 2010, that resulted in the seizure of several items upon which this prosecution is based, lacked probable cause and, therefore, the items seized that day should be suppressed.  In addition, defendant asserts that statements he made to police officers on July 14, 2010, -- while the search was being conducted -- are "fruit of the poisonous tree" and should be suppressed as well.

The Court referred the motion to suppress to Magistrate Judge Erin L. Setser pursuant to 28 U.S.C. § 636(b)(1)(B).  Judge Setser held evidentiary hearings in connection therewith -- one on April 8, 2011, and a supplemental hearing on May 17, 2011.

On May 19, 2011, the Magistrate Judge issued her Report and Recommendation ("R&R") in which she made proposed factual findings. Based on those findings, Judge Setser recommended that the motion to suppress be denied.

On June 6, 2011, defendant filed timely objections to the Report and Recommendation.  The government filed no objections.

## Standard of Review

Matters referred to a magistrate judge pursuant to 28 U.S.C. § 636(b)(1) must be reviewed de novo by this Court when a party objects to a magistrate judge's findings.  *See United States v. Azure*, 539 F.3d 904, 909 (8th Cir. 2008) (internal citation omitted).  "[D]e novo review constitutes meaningful review. . . ." *Id.* (internal citation omitted).  Such a review requires the district court, at a minimum, to read the transcripts from the suppression hearings.  *See id.* at 910 (internal citation omitted).

In this case, defendant made certain timely and specific objections to the Magistrate Judge's findings.  These objections clearly trigger de novo review.  As such, the Court has read the testimony from both suppression hearings, as well as reviewed the exhibits admitted at such hearings, and reviews the R&R de novo.

## Factual Findings

From the Court's review of the transcripts and exhibits admitted at the suppression hearings, the Court makes the following factual findings:

2

## The Warrantless Entries and Searches

(a)  Kendall Wright is the owner of E-Z Credit Auto Sales ("E-Z Credit"), a car dealership in Springdale.  During the time in question, defendant worked for E-Z Credit detailing cars and as a night security guard.  As part of his compensation for working as a night security guard, defendant was given permission to reside on-site at the business in a separate area that contained a kitchenette, a bathroom, and two other rooms.  No one other than defendant -- not even Mr. Wright -- had a key to the door that led to the rooms where defendant resided, and no one was allowed to enter these rooms without defendant's permission.

(b)  Dave Creek is a captain fire investigator for the Fire Marshal's Office of the Springdale Police Department.  His official title is "Captain Inspector."  (Tr. a 216).  On July 14, 2010, Captain Creek conducted a routine fire inspection of E-Z Credit. When he arrived at the business, he met the manager and he began his inspection of the building.  As he was conducting his inspection, Captain Creek was walking down a hallway toward the detail shop when he encountered a locked door with a glass porthole that had been covered so that you could not view what was behind the door.  He asked the manager what was behind the door, and the manager jokingly said those are "Billy's rooms" -- referring to the defendant, William Cannon.  (Transcript from April 8, 2011, Suppression Hearing (Tr. at 216)).

3

(c)   Captain Creek requested access to the locked rooms in order to complete his inspection of the premises.  The manager did not have a key so he called someone at one of the other business locations and, after a period of time, defendant arrived with a key to the rooms.   Captain Creek recognized defendant from his inspection of E-Z Credit's other location.   When he advised defendant that he needed access to the rooms, defendant asked Captain Creek "if he could have a moment" and, after defendant went into the rooms, Captain Creek "heard a lot of rummaging around." (Tr. at 218).

(d)   After a period of time, Captain Creek told defendant he needed to come in and complete his inspection and defendant came to the door and invited him in.  When he initially entered the rooms, Captain Creek encountered what he thought might be a break room because he saw a refrigerator and a sink with some cabinets, but no stove.  In this room, there was a sign on the wall with the words "The Boys Club" and the room was wallpapered with repetitive images of a young boy's face -- specifically, the face of Zac Hanson from the 90's band the Hanson Brothers.  Then Captain Creek went down a hallway into another room where there was a commode and a bathtub/shower with various personal items present, *e.g.,* shampoo, shaving cream, towels, and men's clothes.  Hanging from the ceiling in this room were several mutilated baby dolls, tied with string by

4

their necks and feet.  This room did not appear to Captain Creek to be a working bathroom.

(e)  Captain Creek then entered a back room that was painted black, which Creek expressed gave it a "dungeon kind of like appearance." (Tr. at 223).  The room contained a toddler's bed, more mutilated dolls (dolls bound, blindfolded, gagged, arms missing, legs missing, hanging upside down and by the neck).  In addition, he observed material that looked like blood, pictures of adolescent males, signs (stating things like "Boys Club;" "kill little boys"  "I (heart) boys;" "I Eat boys;" and "Boy killer"), a tripod, a big screen TV, and children's toys.  It was obvious to Captain Creek that "some things were moved or taken down maybe" during the time that defendant was in the rooms before Creek entered. (Tr. at 223).  At this point, Captain Creek did not consider this room to be anyone's bedroom.  Creek testified that he thought that this room might be a place where someone "might crash" occasionally -- because there was a pallet on the floor -- but in his opinion, it did not look like a residence.  (Tr. at 228-29).  Later that day, Captain Creek was told by the manager that defendant served as a night watchman for the business and that defendant "stayed there on occasion".  (Tr. at 229).

(f)  After viewing these rooms, Captain Creek was disturbed and upset, and he told defendant that he was calling the authorities.  Captain Creek then called the Springdale Police

Department and told them that he believed he had discovered a "child pornography operation."  (Tr. at 223).

(g)  Before the officers arrived, Captain Creek witnessed defendant and another gentleman making several trips in and out of the rooms to remove certain items.  Captain Creek did not see what they were removing.

(h)  Officer Eric Holland is a patrolman for the Springdale Police Department.  Holland was one of the first officers to arrive at the scene.  Officer Holland recalled that Captain Creek told him that the rooms were "Billy's rooms" and that defendant rented them out.  Captain Creek does not recall telling Officer Holland that the defendant rented out the rooms.  (Tr. at 239-40).

(i)  Captain Creek also told Officer Holland that the walls in the rooms "were just adorned with pictures of half-nude boys and things of that nature, just some very unusual things. . . ." (Transcript from Supplemental Suppression Hearing held on May 17, 2011 (Supp. Tr. at 25)).

(j)  Officer Holland believed the rooms were defendant's residence, so he asked defendant if he could "step back in [the rooms] just to confirm what Captain Creek did see", and defendant gave his consent for Officer Holland to reenter -- Holland did not tell defendant that he wanted to search the rooms, and he did not ask him to sign a consent to search form.  (Supp. Tr. at 26-27, 29).  When Officer Holland entered the rooms, he saw that "the

walls were basically wallpapered with pictures of young boys . . . some of them were half-dressed. . . . ." (Supp. Tr. at 28).  He also saw the mutilated dolls hanging from the ceiling and the various signs about boys.

(k)  Officer Holland believed that, based on what he saw, the "totality of it," there was "likely child porn in [there]." (Supp. Tr. at 33).  However, Officer Holland did not see any pictures of nude children and did not see anything that he believed constituted child pornography.

(l)  Officer Holland never talked to the detectives who subsequently arrived at the scene about what Captain Creek told Holland about defendant living in the rooms, or about what Holland observed in the rooms.

(m)  Detective Al Barrios is a detective with the Springdale Police Department.  He has been employed by the Springdale Police Department since 1993, and has been an investigator assigned to the Criminal Investigation Division for 12 years.  He is currently assigned to the internet crimes against children task force.

(n)  On July 14, 2010, Detective Barrios and Detective Hignite, who is also an investigator with the Springdale Police Department, were asked to respond to a call about a possible child pornography location.  They arrived at E-Z Credit, and Detective Barrios was the lead investigator on the case.  Detective Barrios

has led hundreds of investigations, and "dozens if not hundreds" involving child victims." (Tr. at 301).

(o) When the detectives arrived, they met Captain Creek and they had an initial brief discussion. Captain Creek told the detectives that he was conducting a fire inspection of the business when he came upon the locked door, and that the manager had to call someone at another location to get the key and "once [defendant] arrived, [he] unlocked [the door]. . . ." (Tr. at 269). Captain Creek told the detectives that, when he entered the rooms, he saw mutilated baby dolls hanging from the ceiling, multiple pictures of adolescent boys, a toddler bed, a tripod, a big screen tv, and the signs (described above) -- "all indicating doing things to -- you know, involving young boys." (Tr. 262).

(p) Detective Barrios testified that Captain Creek also told the detectives that he had "observed some disturbing posters and signs and images that included images of nude children under the age of 13 and 14." (Tr. at 11). Captain Creek does not recall whether he saw nude photographs of young boys, or whether he told Detective Barrios that he saw nude pictures. (Tr. at 265-67). He testified that "I may -- possibly I saw nude pictures and told them of nude pictures." (Tr. at 274).

(q) The Court finds that Captain Creek did, in fact, tell the detectives that he had seen nude pictures of adolescent boys on the walls in the rooms. The Court bases this finding on the following:

8

* Detective Barrios' testified that he specifically recalls Captain Creek telling him that he saw nude pictures of adolescent boys before they entered the rooms and -- although defendant argues that his testimony is self-serving and tainted by what he ultimately viewed when he entered the rooms -- the Court finds no evidence that Detective Barrios is being untruthful.

* It is undisputed that there was a nude picture of a young boy on the wall in plain sight in the back room. Captain Creek testified that he did see that nude picture along with "a number. . . of photographs that [were] in those rooms." (Tr. at 278). The Court finds that it is only reasonable to believe that Captain Creek told the detectives what he saw.

(r)  After the detectives spoke with Captain Creek, they all entered the rooms. At this point, defendant was not present, and he did not give the detectives consent to enter the rooms.

(s)  The Court finds that Detectives Barrios and Hignite did not know that the rooms constituted defendant's private residence before they entered the rooms. The Court bases this finding on the following:

* Captain Creek testified that he was not told that the rooms were defendant's private living quarters, and he did not even know that defendant stayed in the rooms

9

occasionally as a night watchman until later that day. (Tr. at 217, 220, 227-29, 272-73).

* Captain Creek testified that he did not tell the detectives that defendant was living in the rooms, and that the only information that he conveyed was that the defendant was a night watchman who may stay there occasionally. (Tr. at 229-31).

* Although Detective Barrios recalls that Captain Creek told him that defendant was living in the rooms, Captain Creek and Detective Barrios both testified that they did not discuss the fact that defendant may be staying/living in the rooms until after they had already entered the rooms and were looking around. (Tr. at 198, 200-01, 271-72).

(t) When the detectives entered the rooms, they observed the same items and decor as had Captain Creek and Officer Holland. In addition, Detective Barrios observed a photo in the back room -- the room painted black with a toddler bed -- of an adolescent boy, facing forward with his hands placed on the back of his hips, and fully exposing his genitalia. Captain Creek and the detectives also observed evidence that led them to conclude that additional pictures had been removed from the walls prior to their arrival. Detective Barrios' overall opinion, based on his years of experience -- which includes conducting dozens if not hundreds of

10

investigations involving child victims -- was that this backroom had a theme of "sex and violence toward children."  (Tr. at 14).

(u)  The detectives did not conduct a search at that point. Rather, Detective Barrios took some photographs and then the detectives left the rooms.

(v)  The Court has reviewed the photographs taken by Detective Barrios of the rooms in question, which were made exhibits at the suppression hearing.  The photographs reveal that, in the rooms, there were many pictures on the walls of adolescent boys.  Most of the pictures are of the children's faces, but there are a few pictures of partially nude boys (with no shirts on) and one picture of a young boy standing and exposing a full frontal view of his genitals.  The background of the picture is covered by a mirror on one side and another larger picture on the other side, and most of the boy's arms are cropped out of the picture, such that "[t]he only thing that was shown in this image on the wall was this nude child and his penis clearly displayed."  (Tr. at 19).

(w)  Detective Barrios then instructed the other officers at the scene to secure the premises until they could get a search warrant.  He also asked defendant if he would be willing to go back to Detective Barrios's office for an interview, and defendant agreed.

(x)   After they exited the rooms, Captain Creek made a handwritten statement of the events that transpired that day, describing what he observed:

> Mr. Cannon walked in with the keys - I told him I need to inspect the rooms for fire hazards.  He recognized me from previous inspection.  He unlocked the deadbolt and asked me if he could have [a] minute before I came in. My suspessions (sic) were increased after 2-3 minutes of him inside with the door closed rummaging around I spoke thru the door stating enough time I needed to complete the inspection.  He opened the door and allowed me in. The 1st room was a small kitchen area with wall papered in a small boys picture from floor to ceiling, kids blocks, toys, cabinet door & drawers damaged.  Off the kitchen was a small bathroom with no light covered in pictures also.  To the right of the kitchen was a dark painted room with a sign above the door which read "Boys Club."  In this room was a child bed, big screen TV, multiple boy pictures, signs I (heart) boys, Boys, camera tripod etc.  I looked at Mr. Cannon and said I've seen enough I'm calling authorities.

(Handwritten Statement of Captain Creek, Exhibit 4 admitted at Suppression Hearing held on April 8, 2011).

(y)   After they arrived at the Springdale Police Department Criminal Investigation Division, Detective Barrios interviewed defendant.  Detective Barrios advised defendant that he was not under arrest, and that he was not in custody -- but he read him his Miranda rights out of an abundance of caution.  While Detective Barrios interviewed defendant, Detective Hignite prepared an Affidavit and Application for Search Warrant (the "Affidavit"), which was signed by both detectives.

(z)   During the interview, defendant advised Detective Barrios that he did not have a home, and that he stayed at the business

three nights a week because he was the security guard.  Defendant said that the rooms were his artistic expressions and that the nude picture that they had seen that day (the full-frontal nude picture described above) had come from an art book.  Detective Barrios was skeptical of this explanation because he believed that defendant had made several contradictory statements during the interview.

(aa)  After Detective Hignite prepared the Affidavit, Detective Barrios reviewed it for accuracy and then they went before the Honorable Mark Lindsay, Washington County Circuit Court.

### The Search Warrant

(bb)  The detectives sought to search a "residence" owned by E-Z Credit as well as a specific vehicle, which was allegedly owned by defendant and located at E-Z Credit.

The property to be seized included specific items that the detectives believed would be discovered and would constitute violations of A.C.A. § 5-27-304 (Pandering or possessing visual or print medium depicting sexually explicit conduct involving a child) and § 5-27-403 (Producing, directing or promoting sexual performance of a child).

The Affidavit listed the detectives' experience with child pornography and sex crimes.

(cc)  The probable cause portion of the Affidavit states, in relevant part:

> On Wednesday, July 14, 2010 . . . Detective D. Hignite and Detective A. Barrios responded to [the

13

business location] to a report of child pornography being located inside of a commercial business in Springdale.

* * *

The detectives then made contact with the Fire Marshal Dave Creek . . . [who] stated that he asked to go into the room and was advised that the room was living quarters for the detail person of the business William Cannon. Mr. Creek advised that he is required to do a search of the locked room. Cannon said he is currently living in the room and advised Mr. Creek that he could inspect the room but needed to clean up first. Mr. Creek advised that he allowed the individual access to the room for that purpose.

Mr. Creek stated that at that point he could hear things being moved around in the room. Mr. Creek was then allowed into the room. Mr. Creek stated that he witnessed pictures of small boys on the walls of the living area and also the kitchen area of this room. He said that the boys were in various forms of undress. He said that some of the pictures were of small boys nude stuck to the wall. He said that there were several handmade signs saying "I kill boys" and nude baby dolls being suspended upside down in bondage positions. He said that he also saw a video camera and tripod in the room.

* * *

Detectives then looked in the room in question and noticed there were two adjoining rooms located in this business that appeared to have someone living in it. The first room appeared to be used as a kitchen area attached to a bathroom. The second area was a bedroom area with a television. The detectives noted that the first room was covered with pictures of a small boy that appeared to be of a child actor. In the bathroom area there were several naked dolls that were suspended upside down by a string. The mouths of the babies appeared to have tape over them. There was a wrapping paper covering the inside of the door entering the first room that had flyers from the National Center for Missing and Exploited Children. It appeared that someone attempted to remove some of them, but was unable to remove them all.

14

In the bedroom area of the quarters contained several handmade signs that said "boys rock, boy killer, I love boys, kill little boys, and boys only." There were several pictures of boys on the walls. All appeared to be between 8 years old and 12 years old. There appeared to be several photographs removed from the wall. The pictures were affixed to the wall using putty. There were fragments of pictures that were torn and not removed. There was one picture located on the South wall of a child appearing to be pre-pubescent with no clothing and exposing a full frontal view of his genital area."

(Affidavit of Detectives and Barrios and Hignite, Exhibit 3 admitted at Suppression Hearing held on April 8, 2011).

(dd) The Affidavit was incorrect in that it stated that Captain Creek was advised that these rooms were defendant's living quarters. (*See* Tr. at 273). The Court finds, based on the testimony of the detectives, that this mistake in the Affidavit was inadvertent.

(ee) The detectives provided the Affidavit to Judge Lindsay. After Judge Lindsay reviewed the Affidavit, and placed Detective Hignite under oath, he asked the following questions:

Judge Mark Lindsay: All right.  I did not get the connection between the car in the Affidavit and this Mr. Cannon.

Detective Hignite: The -- Mr. Cannon was seen leaving the rear of the business where that car was located. That vehicle does belong to Mr. Cannon, and we believe that's where he allegedly stashed the stuff.

Judge Mark Lindsay: All right. Then the gentleman, Mr. Creek, is the person that called –

Detective Hignite: That is correct, sir.

15

Judge Mark Lindsay: -- the police initially, and you talked to him personally?

Detective Hignite: Yes sir. And I also have a written Affidavit from --

Judge Mark Lindsay: Okay

Detective Hignite: That is correct, sir.

Judge Mark Lindsay: -- and believable?

Detective Hignite: Yes, sir.

Judge Mark Lindsay: Okay. All right. And this doesn't need to be -- there's no exigent circumstances here, are there? It doesn't need to be, you know, where you can search outside the normal hours?

Detective Hignite: No, sir.

Judge Mark Lindsay: All right. If one, or both of you, however many is going to sign, will go ahead and sign, then I'll acknowledge your signature and issue the Warrant. As we finish our signatures, we'll go off the record here at about 2:44 p.m.

(Transcript of Proceedings before Judge Lindsay, Exhibit 5 admitted at Suppression Hearing held on April 8, 2011).

(ff) The handwritten statement of Captain Creek was attached to the Affidavit, and was available for Judge Lindsay's review. Detective Barrios told Judge Lindsay that he had pictures that he had taken from the scene, but Judge Lindsay declined to view the pictures. After he reviewed the materials and questioned Detective Hignite, Judge Lindsay issued the search warrant.

16

## <u>Execution of the Search Warrant</u>

(gg) After the search warrant was issued, the detectives returned to the scene and searched the premises.  Defendant was also returned to the scene and, although he was not in custody, he told the detectives that he wanted to be present during the search.

(hh) During the search, the detectives seized the following items, among others:

* 15 photocopies of nude children (1 picture was the one that was still on the wall and 14 other nude pictures were found on the ground, down by the bed);

* 2 laptops, one of which was later discovered to contain child pornography;

* a briefcase that contained mini DV cassettes (one of which was later discovered to contain a juvenile female engaging in sexually explicit conduct) and handwritten journals; and

* a tool box containing syringes and scalpels, etc.

(ii) After the detectives discovered these items, they placed defendant under arrest.

(jj) The detectives subsequently obtained a second search warrant to forensically examine the computers, the hard drive and electronic media, etc. that was previously seized.  That warrant was issued on July 21, 2010, by the Honorable Mary Ann Gunn. Defendant contends that, if the items had not been seized on July 14, 2010, there would not have been a second warrant.

17

## The Magistrate Judge's Report and Recommendation

On May 19, 2011, the Magistrate Judge issued her R&R in which she made the following proposed findings:

> A.  Defendant had a reasonable expectation of privacy in the rooms.
>
> B.  Defendant had a reasonable expectation of privacy in his personal belongings.
>
> C.  Neither exigent circumstances nor consent existed as a basis to justify the warrantless entry into the rooms.
>
> D.  Despite the above, the independent source doctrine allows the admission of the evidence seized.
>
> E.  Even if the independent source doctrine did not apply, the *Leon* good faith exception applies and bars application of the exclusionary rule.
>
> F.  There was sufficient probable cause of criminal activity to issue a search warrant and the specific deficiencies alleged by defendant did not invalidate the warrant.

*   Defendant agrees with the findings in "A," "B" and "C."

*   Defendant makes specific objections to the findings in "D" and "E."

*   Defendant makes no specific objection to the proposed findings in "F" -- other than to say that "[w]ithout waiving any argument heretofore made, [defendant] has nothing to raise to add to these issues other than what was developed in his previous briefs filed herein and arguments made during the respective hearings." (Defendant's Objections to Magistrate Judge's Report and Recommendation at 19) (Doc. 40).

18

## Discussion

At the outset, the Court notes that, based on its factual findings outlined above, it agrees with the Magistrate Judge's findings that defendant had a reasonable expectation of privacy in the rooms, that he had a reasonable expectation of privacy in his personal belongings, and that neither exigent circumstances nor consent existed as a basis to justify the warrantless entry into the rooms.  Defendant also agrees to these findings, and the government has made no objections.  Thus, the Court will adopt those findings.

The Court now turns to those findings to which defendant has objected.

### A.    The Independent Source Doctrine

Defendant first objects to the Magistrate Judge's finding that the independent source doctrine allows the admission of the evidence seized.  Defendant contends that the Affidavit is so tainted by what the detectives saw when they made their warrantless entry into the rooms, that it cannot be considered in determining whether probable cause existed.  Absent the Affidavit, all that is left is Captain Creek's handwritten statement.  Defendant asserts that Captain Creek's handwritten statement is not enough to support probable cause for the search warrant.

The independent source doctrine -- which is closely related to the inevitable discovery doctrine -- is an exception to the

19

exclusionary rule.  *See United States v. Swope*, 542 F.3d 609, 613 (8th Cir. 2008).  The independent source doctrine allows for the admission of evidence that was acquired through a source independent of the taint.  *Id.*  The Eighth Circuit has recently explained the independent source doctrine as follows:

> A warrant obtained after an illegal search is not an independent source if either of the following are true: "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry," and "if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Murray* [*v. United States*], 487 U.S. [533, 542, 108 S. Ct. 2529, 101 L. Ed. 2d 472 [(1988)] In other words, *Murray* asks the following two questions, both of which must be answered in the affirmative for the warrant to be an independent source: first, would the police have applied for the warrant had they not acquired the tainted information; and second, do the application affidavits support probable cause after the tainted information has been redacted from them.

*U.S. v. Craig*, 630 F.3d 717, 721 (8th Cir. 2011)(*quoting Swope*, 542 F.3d at 613-14 (8th Cir. 2008).

\*    As to the first question, whether the officers would have applied for a search warrant had they not initially entered the rooms and observed the photos and other items contained therein, Detective Barrios testified that he would have sought a search warrant.  (Tr. 198).  Defendant does not oppose this finding.

\*    The more complicated question, and the one that defendant focuses his argument on, is whether the Affidavit supports probable cause after the tainted information has been redacted from it --

20

the tainted information being all of the information about what the detectives saw during their warrantless entry into the rooms.

The standard for determining whether probable cause supports a search warrant was set out by the Magistrate Judge and defendant does not object to the standard applied, which is:

> In determining whether probable cause supports a search warrant, the Court must consider whether a "fair probability that contraband or evidence of a crime will be found in a particular place, given the circumstances set forth in the affidavit." United States of America v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010), cert. denied, 131 S.Ct. 1469 (2011) quoting United States v. Horn, 187 F.3d 781, 785 (8th Cir. 1999), cert. denied, 529 U.S. 1029 (2000). "Probable cause is a fluid concept that focuses on 'the factual and practical consideration of everyday life on which reasonable and prudent men, not legal technicians, act.'" Colbert, 605 F.3d at 576, quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)(internal quotation omitted). This determination requires a "commonsense analysis of the facts available to the judicial officer who issued the warrant." Colbert, 605 F.3d at 576.

(Magistrate Judge's Report and Recommendation, at p. 23) (Doc. 38).

The Court finds that, based on its factual findings outlined above, there was probable cause to support the search warrant absent the tainted information. Specifically, Judge Lindsay would have been presented with the information in Captain Creek's handwritten statement along with the portions of the Affidavit that describe what Captain Creek told the detectives. When the Court looks at the totality of the circumstances, the Court finds that there was probable cause to issue the search warrant absent the

tainted information about what the detectives observed during their warrantless entry into the room.

Indeed, Captain Creek reported that he believed, based on what he saw, that he had discovered a child pornography operation. That information, along with his specific reports about seeing nude pictures of children displayed on the walls in an adult man's place of residence, with signs saying "I (heart) boys" and "I kill boys," a toddler-sized bed, a camera tripod, and all of the other circumstances, was sufficient to establish probable cause to believe that child pornography would be found in the rooms. *See, e.g., United States v. McArthur*, 573 F.3d 608, (8th Cir. 2009) (finding probable cause existed where only one image of a nude child was found because, under the totality of the circumstances, the evidence as a whole established probable cause.).

All of these details are found in Captain Creek's handwritten statement and the portion of the Affidavit describing what Captain Creek told the detectives, which this Court has already found to be credible testimony, as set forth above. Thus, the second *Murray* question is satisfied and the independent source doctrine bars the application of the exclusionary rule such that the evidence seized is admissible.

**B.** **Captain Creek's handwritten statement was sufficient to support probable cause.**

Further, even if the Court were to exclude the entire Affidavit from consideration, as defendant suggests, a copy of

Captain Creek's handwritten statement was attached to the Affidavit. (*See* Tr. at 30). As set forth above, that handwritten statement describes what Captain Creek saw when he entered the rooms, which was in relevant part:

* a small kitchen area with a wall papered in a small boys picture from floor to ceiling; and

* a dark painted room with a sign above the door which read "Boys Club," a child['s] bed, big screen TV, multiple boy pictures, signs "I (heart) Boys," "Boys," and a camera tripod etc.

If Captain Creek's handwritten statement is sufficient to support a finding of probable case, then the search warrant is valid. *See United States v. Koonce*, 485 F.2d 374, 379 (8th Cir. 1973). The Court finds that, under a commonsense application of the facts, Captain Creek's handwritten statement was enough, by itself, to support probable cause for a search of the rooms.

### C.   <u>Good Faith Exception</u>

The Magistrate Judge found that, even if the independent source doctrine did not apply, the *Leon* good faith exception applies and bars application of the exclusionary rule.

Defendant asserts that, because the Magistrate Judge found that defendant had a privacy interest in the rooms and his personal belongings contained therein, "it strains credulity to then contend that the detectives could rely on the *Leon* good faith exception to

justify their illegal actions."   (Defendant's Objections to Magistrate Judge's Report and Recommendation, at 14) (Doc. 40).

Defendant focuses his argument on his assertion that Detective Barrios knew before he initially entered the rooms that the door had been locked and that "someone didn't want just anybody in that room." (Tr. at 210).  Defendant also points out that Detective Barrios knew that defendant was the only person who had a key. (Tr. at 212).

Defendant also places great emphasis on the fact that, in the Affidavit, Detectives Barrios and Hignite stated under oath that:

> The detectives then made contact with the Fire Marshal Dave Creek . . . [who] stated that he asked to go into the room and was advised that the room was living quarters for the detail person of the business William Cannon.  Mr. Creek advised that he is required to do a search of the locked room.  Cannon said he is currently living in the room and advised Mr. Creek that he could inspect the room but needed to clean up first.

In addition, defendant states that, from the view of the rooms from the hallway, the detectives could observe personal items and that they either knew, or should have known, that defendant was living in the rooms and, thus, their pre-warrant search was illegal and the *Leon* good faith exception does not apply.

The Supreme Court in *United States v. Leon*, 468 U.S. 897 (1984) created an exception to the exclusionary rule, holding that the rule should not apply to evidence obtained by a police officer who conducts a search in reasonable reliance on a search warrant that was issued by a neutral and detached magistrate, but is

24

ultimately found to be unsupported by probable cause or otherwise defective.  *Id.* at 920-922.  The Eighth Circuit has applied the *Leon* good faith exception to warrantless searches as well.  *See United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997).

In *Conner*, the police officers demanded entry into the defendants' hotel room because they were suspicious that the defendants were hiding stolen goods and guns in the room.  When the defendant opened the door to the room, the officers observed the stolen items.  The officers stayed in the room and secured the premises until a search warrant was obtained  The search warrant application stated that the officers had seen in "plain view" the stolen items.  The officers seized the items, searched the rooms and arrested the defendants.

The district court suppressed the seized evidence, finding that the officers' entry into the hotel room was illegal and that they could not invoke the *Leon* good faith exception because the police could not reasonably believe that the defendants consented to entry of the room or that exigent circumstances existed.  The Eighth Circuit affirmed, holding that, if the officers' pre-warrant conduct is "clearly illegal," the good-faith exception does not apply.  *Id.* at 667 (internal quotation marks and citation omitted).

The present case is distinguishable from *Conner* in that the detectives in this case had an objectively reasonable basis to believe they were not violating the law or the Fourth Amendment

when they initially entered the rooms, and when they later searched the rooms after obtaining the warrant.  Specifically, the detectives were asked to respond to a call about possible child pornography at a business -- a used car dealership -- in Springdale.  When detectives arrived, the business was open, employees on the premises and cars for sale on the lot.  The detectives met Captain Creek and briefly discussed what he had found, and then Creek accompanied the detectives into the rooms. While Detective Barrios admits that Captain Creek told him that the door was locked and that defendant had the only key, Detective Barrios testified that he did not immediately assume that defendant lived there.  Given the circumstances of the situation, the Court finds that it was objectively reasonable for the detectives to believe that, when they entered the rooms, they were entering part of the business -- and not a residence.

It is clear that, at some point, the detectives learned that defendant was, in fact, living in the rooms.  The Court believes, however, that the detectives did not actually discover the true nature of defendant's use of these rooms until after they had already entered the rooms, talked further with Captain Creek and observed certain items in the rooms, *e.g.,* the pallet on the floor in the back room.

The detectives did not search the premises at that time; they stopped what they were doing, exited the rooms and obtained a

search warrant.  The Court finds that, for the reasons stated above, the *Lean* good faith exception applies here and that the evidence seized is admissible.  *See United States v. White*, 890 F.2d 1413, 1419 (8th Cir. 1989).

        **D.**   **Other alleged deficiencies in the search warrant**

In addition to the issues described above, defendant raises the following alleged deficiencies in the Affidavit:

1. The Affidavit did not provide any detailed descriptions of the alleged pictures;

2. The single picture described was not sexually suggestive;

3. The detectives mis-described the picture and the nature of it by not disclosing that the nude picture was copied from an art book;

4. The single picture described does not meet the definition of sexually explicit conduct under ACA § 5-27-204

5. The information regarding the pictures and signs along with the claim of a video camera and tripod was included in order to elicit an emotional response and was devoid of any evidence of wrongdoing;

6. It is not illegal to possess a video camera or tripod;

7. The decor in defendant's rooms was intended to be offensive and was an artistic expression;

8. The Affidavit failed to establish that the single nude picture was ever determined to be child pornography;

27

9.   The Affidavit failed to establish that defendant was a pedophile or child pornographer.

The Court has reviewed the Magistrate Judge's conclusions with respect to these particular issues.  Defendant has not pointed the Court to any specific error in the Magistrate Judge's R&R with respect to these particular issues.  The Court finds that, in the context of its de novo review of the record, these findings are well-reasoned and sound and, therefore, will be adopted.

**E.   <u>The statements defendant made during the search</u>**

Finally, although not addressed by the Magistrate Judge in her R&R, defendant seeks to suppress the statements he made to the police while they were executing the search warrant because he was wrongfully detained during that period of time.  The Court finds that defendant was not detained, that he voluntarily stayed while the warrant was being executed and that any statements he may have made during that time were voluntary and there is no basis to suppress them.

**IT IS THEREFORE ORDERED** that the Magistrate Judge's Report and Recommendation is **adopted;**

**IT IS FURTHER ORDERED** that defendant's objections are **overruled;** and

28

**IT IS FURTHER ORDERED** that the defendant's **Motion to Suppress** (Doc. 24) is hereby **denied.**

**IT IS SO ORDERED.**

**/s/ Jimm Larry Hendren**
**JIMM LARRY HENDREN**
**UNITED STATES DISTRICT COURT**